Maria PENA, individually, and as the Administrator of the Estate of Dilcia Pena; Marietta Small, Public Administrator of Kings County, as Administratrix of the Estate of Andy M. Herrera; Maria Delcarmen Herrera, and as Intended Administratrix of the Estate of Ricardo Nicanol Herrera; and Victor Herrera, as father of Andy M. Herrera and Nicanol Herrera, deceased, Plaintiffs–Appellees,

v.

Thomas DEPRISCO, Captain; Roy Richter, Captain; Rick Carpen, Lieutenant; Peter Moy, Sergeant; Michael Zarilli, Sergeant; Dennis Healy, Sergeant; Keith Singer, Sergeant; Jack Conway, Police Officer; John Welsh, Police Officer; Edward Sills, Police Officer; Anthony Prinzano, Police Officer; Michael Gaudio, Police Officer; Marie Desario, Police Officer; Paul Alba, Police Officer; John Chavez, Police Officer; Michael McGill, Police Officer; Brian T. White, Captain; Martin Finkelstein, Police Officer; Craig Hilderbrand and Michael Im-

---

mett, individually and in their official capacity as agents of the PBA; "John" Gallo, (first name being fictitious and presently unknown); and Vincent Fiorenza, Defendants–Appellants,

City of New York; the Patrolman's Benevolent Association of the City of New York, individually and in their official capacity as New York Police Officers; Joseph Grey; "John" Rabinowitz, (first name being fictitious and presently unknown); "John Does," individually and in their official capacity as Police Officers and non-uniformed employees of the New York City Police Department, the identity and number of whom is presently unknown; "Richard Roes," individually and in their official capacity as New York City Police Officers, Supervisory Police Officers of the City of New York, the identity and number of whom is presently unknown; "William Woes," individually and in their official capacity as Police Officers and/or agents for the PBA, the identity and number of whom is presently unknown; the Wild Wild West, Inc.; Brian T. White, Captain; David C. Gaskin; and Patrick Lynch, in his official capacity as President of the PBA, Defendants.

Docket Nos. 03–7876 (L), 03–7962(CON), 03–7880(CON), 03–7929(CON) and 03–7940(CON).

United States Court of Appeals, Second Circuit.

Argued: Dec. 2, 2004.

Decided: Dec. 9, 2005.

Eugene B. Nathanson, New York, NY, for Plaintiffs–Appellees.

Alan Beckoff (Michael A. Cardozo, Corporation Counsel of the City of New York, Stephen J. McGrath, Alan H. Scheiner, Zachary A. Cunha, of counsel), New York, NY, for "Municipal" Defendants–Appellants.

Gregory M. Longworth, Worth, Longworth & London, LLP (John W. Burns, of counsel), for Defendants–Appellants Police Officers Jack Conway, Michael Gaudio, Craig Hilderbrand, Edward Sills, Anthony Prinzano, Marie Desario, Paul Alba, John Chavez, Michael McGill, Martin Finkelstein, John Welsh, Michael Immit, and "John Gallo."

Andrew C. Quinn, Quinn, Ferrante & Mellea, LLP (Bruno V. Gioffre, Jr., Rosa Luna–Molé, of counsel), White Plains, NY, for Defendants–Appellants Dennis Healy and Keith Singer.

Mark P. Goodman, Debevoise & Plimpton LLP (Mary Jo White, Howard S. Hogan, Laura E. Neish, of counsel) for Amicus Curiae Patrolmen's Benevolent Association of the City of New York.

Before: WALKER, Chief Judge, SACK and HALL, Circuit Judges.

SACK, Circuit Judge.

On August 4, 2001, off-duty New York City police officer Joseph Grey,[1] while heavily intoxicated, drove his automobile through several red lights on a Brooklyn street, striking three people, one of whom was pregnant, and killing them all. The plaintiffs, in both representative and individual capacities, brought a variety of claims against Grey and other persons who allegedly, among other things, implicitly encouraged and sanctioned Grey's abuse of alcohol and driving under its influence. The plaintiffs contend that the law enforcement officials' approval of Grey's behavior created a danger to the decedents for which the defendants may be held liable under 42 U.S.C. § 1983. The district court denied the defendants' motion brought under Federal Rule of Civil Procedure 12(b)(6) to dismiss the plaintiffs'

complaints. *See Small v. City of New York*, 274 F.Supp.2d 271, 282 (E.D.N.Y. 2003). Some of the defendants appeal, asserting that they were entitled to qualified immunity with respect to the state-created-danger claims.

We agree with the district court that the plaintiffs have alleged facts which, if proven, might constitute a violation of the plaintiffs' "substantive due process" right to be free from state created dangers. In other words, assuming as we must at this stage of the proceedings that the plaintiffs' charges are true, we conclude that the defendants' behavior would have violated fundamental constitutional rights of the victims. Yet, because that interpretation of the Due Process Clause was not clearly established at the time of the defendants' actions, under principles of qualified immunity, they cannot be held individually liable.

We therefore vacate the order of the district court denying the defendants' motion to dismiss insofar as it is based on such behavior, and we remand with instructions to dismiss the complaint to that extent on the grounds of qualified immunity.

## BACKGROUND

This appeal is limited to whether individual defendants are entitled to qualified immunity with respect to their alleged violations of the Fourteenth Amendment's guarantee of substantive due process. In stating the facts for purposes of considering this appeal, we take all of the plaintiffs' allegations to be true "and draw all reasonable inferences in the plaintiff[s'] favor." *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir.2003). The narrative that we are about to repeat therefore paints vari-

---

1. There is some discrepancy in the parties' filings as to whether the name is spelled "Gray" or "Grey." Because the case caption lists the name as "Grey," we use that spelling.

ous defendants in "decidedly unflattering colors," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir.2001), which may or may not be borne out by the facts.

*Facts as Alleged*

When, in 1984, Grey first applied to be a New York City police officer, he disclosed his history of drinking problems to the New York City Police Department. Although he continued to drink heavily during his time as a member of the force, he was never questioned, disciplined, or counseled about his alcohol use. Indeed, during Grey's tenure, it was common practice for both off-duty and on-duty officers to drink at or near the police precinct house. The drinking was done, at least in part, in public and with the full knowledge of Grey's supervisors.

When Grey ended his shift at 8:00 a.m. on Saturday August 4, 2001, he embarked on a twelve hour drinking binge. It began in the company of fellow police officers and supervisory police sergeants in the parking lot of the 72nd Precinct on Fourth Avenue in Brooklyn, New York. Around noon, Grey's supervisor, Sergeant Dennis Healy, who had been drinking with the rest of the group in the precinct lot, asked Grey to drive him to "The Wild, Wild West," a local "strip club." The bar had been declared by department officials to be "off limits" to police officers—a designation that officers ignored that day as they apparently had in the past. After Grey drove Healy to the bar, they were joined there by other police officers.

Some four or five hours after their arrival at the bar—eight hours or so into Grey's drinking for the day—Sergeant Healy asked the inebriated Grey to drive him back to the 72nd Precinct house. When they arrived, at about 5:00 p.m., Grey entered the building to use the toilet. Although he was visibly intoxicated, neither the desk sergeant, the patrol sergeant, nor any of the on-duty officers with whom Grey came into contact did anything to reprimand him or to prevent him from leaving, returning to the driver's seat of his automobile, or driving drunk. Undeterred, Grey drove back to the strip club, apparently without Healy, to continue drinking.

Another two or three hours later, Grey prepared to return to the 72nd precinct for his next shift. At this point, he had been drinking continuously for nearly twelve hours and had not slept in more than twenty-two. At around 9:00 p.m., Grey sped through multiple red lights and—without sounding his horn or braking—struck and killed Maria Herrera, her son, Andy Herrera, and her sister, Dicia Pena as they attempted to cross Third Avenue, in Brooklyn. The pedestrians were in the north crosswalk of 46th Street, crossing Third Avenue in accordance with the "walk" signal. Maria Herrera was eight-and-a-half months pregnant at the time. Her son, Ricardo Nicanol Herrera, Andy's brother, was delivered in the hospital by cesarean section, but died shortly after his birth.

Afterward, the plaintiffs allege, other New York City police officers and the Patrolmen's Benevolent Association ("PBA")[2] hindered the investigation. No sobriety tests were administered at the crime scene. Officers discussed which sobriety test Grey would be able to "beat." The police delayed testing Grey's alcohol blood level for several hours. The Accident Investigation Squad mishandled evidence by: (1) contravening orders from

---

**2.** The defendant Patrolman's Benevolent Association of The City of New York is New York City's "largest police union." Steven

Greenhouse, *Mediator is Appointed for Police Contract Talks*, N.Y. Times, August 16, 2001, at B3.

the Kings County District Attorney's office by delivering Grey's blood samples to a non-authorized lab instead of the medical examiner's office, (2) failing to develop photographs taken at the scene of the crime, (3) losing or destroying inculpatory evidence, (4) intimidating and otherwise pressuring civilian witnesses to change their version of the events, and (5) suppressing the results of Grey's "alco-sensor" test. As discussed below, these post-accident allegations are not the subject of this appeal.

On May 2, 2002, Grey, who by then had resigned from the force, was convicted following a jury trial in New York Supreme Court, Kings County (Anne G. Feldman, *Justice*) of one count of driving while intoxicated, one count of driving with a suspended license, and four counts of second degree manslaughter for recklessly causing the deaths of the four persons he had killed. On May 23, 2002, Grey was sentenced to an indeterminate prison term of five to fifteen years.

*The Current Lawsuit*

The surviving relatives and the administrators of the victims' estates brought this action in two separate complaints against individual police officers, the City of New York, the PBA, and The Wild, Wild West, Inc. Although worded slightly differently, the complaints assert, in substance, four federal claims: (1) violation of the plaintiffs' and decedents' substantive due process right to be free from state-created dangers, (2) denial of the plaintiffs' access to the courts, (3) conspiracy to engage in such acts, and (4) conspiracy under 42 U.S.C. §§ 1983 and 1985 to deny equal protection of the law to the plaintiffs and the decedents. Because the claims brought by the plaintiffs pertain to conduct occurring before the accident (the state-created-danger claims) and after the acci-

dent (the denial of access to the courts claims), and because only the former is the subject of this appeal, we differentiate between the "pre-accident" individual defendants, who are the subject of the state-created-danger claims, and the "post-accident" individual defendants, who are not. We also distinguish between supervisory officers (referred to on the cover of their appellate brief as the Municipal Defendants–Appellants) and Grey's police officer peers.

Pre-accident officer-defendants who drank with Grey in the 72nd Precinct parking lot include: Officers Jack Conway, Craig Hilderbrand, John Welsh, Edward Sills, Anthony Prinzano, Michael Gaudio, Marie Desario, Paul Alba, John Chavez, Michael McGill (all off duty), supervisor Sergeant Dennis Healy (while off duty), and supervisor Sergeant Keith Singer (while on duty). *See* Pena Compl. ¶¶ 6, 39(g) (—®), 59. Police officer defendants who drank with Grey at The Wild, Wild West bar include officers Hilderbrand and Welsh, and supervisor Sergeant Healy (all off duty). *See* Pena Compl. ¶¶ 14, 15, 16, 17, 39(h, j & k), 62. Police officer defendants who saw Grey enter the precinct building in the middle of his drinking binge include: Desk Sergeant Peter Moy and Patrol Sergeant Michael Zarelli (both on duty). Finally, Sergeant Healy asked Grey to drive him to and from The Wild, Wild West bar.

Post-accident officer defendants include: Martin Finkelstein and Vincent Fiorenza (both on duty), *see* Pena Compl. ¶¶ 26, 39(s), 86, 89; Herrera Compl. ¶ 18(j), and PBA officials Michael Immitt and "John"[3] Gallo, *see* Pena Compl. ¶¶ 26, 39(v), (w), 86; Herrera Compl. ¶¶ 18(f), (i). The defendants Captain Thomas DePrisco, Captain Roy Richter, and Lieutenant Rick Kar-

---

**3.** Officer Gallo's actual first name is presently unknown.

pen[4] were not alleged to have been directly involved in the specific events related to the death of the plaintiffs' decedents but had supervisory responsibility over the police officers involved. *See* Pena Compl. ¶¶ 98, 39(b)-(d); Herrera Compl. ¶¶ 18(d), (e), (*l*).[5]

The plaintiffs also brought state-law claims for negligent hiring and supervision against the City and its supervisory officers, as well as the PBA and its officials, and brought other common-law and state-statutory claims against Grey and The Wild, Wild West, Inc. *See* Pena Compl. ¶¶ 145, 151, 156, 162; Herrera Compl. ¶¶ 77–80, 88–92.

### The District Court's Rulings

The "City" or "Municipal" defendants (i.e., the supervisory officers), the PBA defendants, two groups of individual officer defendants, and The Wild, Wild West, Inc., brought separate motions to dismiss the complaints, which the district court (Nina Gershon, *Judge*) addressed in a single opinion and order. *Small*, 274 F.Supp.2d at 271. The court denied motions brought by the City, the PBA, and the individual officers to dismiss the claims asserted under 42 U.S.C. § 1983 for a violation of the plaintiffs' decedents' substantive due process rights to be free from a state created danger. *Id.* at 276–78. The court also concluded that the plaintiffs could state a claim for denial of access to the courts, and granted their motions to amend their complaints. *Id.* at 278–80. Similarly, the district court decided that the plaintiffs had adequately alleged section 1983 conspiracy

claims in relation to both of these substantive claims. *Id.* at 280. The court dismissed the plaintiffs' remaining federal claims, brought under the Equal Protection Clause and 42 U.S.C. § 1985 with prejudice. *Id.* at 281.[6]

Finally, the district court rejected the defendants' assertion of qualified immunity with respect to the plaintiffs' substantive due process right to be free from state-created danger. *Id.* at 281. The court concluded that since *Dwares v. City of New York*, 985 F.2d 94 (2d Cir.1993), "officials in this Circuit have been on notice that police action which emboldens private citizens to injure others may give rise to a substantive due process violation." *Small*, 274 F.Supp.2d at 281. The court also concluded that it would be "premature" to consider whether the defendants reasonably should have known that their actions were unlawful in these specific circumstances because the "defendants ha[d] made no effort to differentiate between the individual officer defendants in regard to what each reasonably should have known in the circumstances of this case." *Id.*

In a subsequent order dated February 3, 2004, the district court denied the defendants' motion to certify interlocutory appeals of the plaintiffs' claims to accompany appellate review of their qualified immunity defense. *Small v. City of New York*, 304 F.Supp.2d 401, 403 (E.D.N.Y.2004). The court reasoned that an interlocutory appeal would be "particularly inappropriate" because

---

**4.** There is some discrepancy in the parties' filings as to whether the name is spelled "Carpen" or "Karpen." Because defendants spell the name as "Karpen," we do so as well.

**5.** Captain White and Officers Gaskin, Lynch, and Rabinowitz are listed in the case caption, but plaintiffs made no allegations concerning them in the body of their complaints.

**6.** Because the plaintiffs made no allegations concerning defendants White, Gaskin, Lynch, and Rabinowitz in the body of their complaints, the court dismissed those claims with leave to amend. *See Small*, 274 F.Supp.2d at 281.

[t]hose defendants who moved to dismiss on qualified immunity grounds did so only on the single issue of plaintiffs' substantive due process claim of the right to be free of state created danger, and not on all of the issues which defendants now seek to present to the Court of Appeals, on an interlocutory basis, before a full development of the facts.

*Id.* (citation omitted). The district court's refusal to certify additional interlocutory appeals does not, of course, affect our obligation to hear appeals based on the defendants' assertions that they are entitled to qualified immunity as a matter of law. *See* Section I of the "Discussion" section of this opinion, below.

*This Appeal*

All of the individual defendants-appellants assert that they are entitled to qualified immunity because (1) the complaints fail to state a viable claim for the violation of the constitutional right to be free from a state created danger, and (2) even if the complaints do state a constitutional violation, the law was not in that respect clearly established when the events in issue took place. In addition, the non-supervisory police officers argue that the "post-accident" police officer defendants, i.e., those defendants who are alleged to be involved only in events that occurred after the victims were struck, are entitled to qualified immunity because the complaints contain only conclusory, vague, or general allega-

tions of a conspiracy to deprive plaintiffs of a constitutional right by denying plaintiffs access to the courts.[7] Finally, the PBA argues in its *amicus curiae* brief that the "post-accident" PBA defendants are entitled to qualified immunity as to the state-created-danger claim, that the officers are entitled to qualified immunity because they did not violate plaintiffs' right of access to the courts, and that the court should exercise its pendent appellate jurisdiction to dismiss plaintiffs' state-law claims against the PBA defendants.

## DISCUSSION

### I. Jurisdiction and Scope of Appeal

■ Because the district court has not entered a final judgment in this case and has declined to certify an interlocutory appeal for its other rulings, the only issue before us on this appeal is whether the defendants are entitled to qualified immunity. "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision,' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of final judgment." *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In the district court, the defendants asserted a qualified immunity defense as to only the state-created-danger claim, not the denial of access to courts claim.[8] The district court, in its

---

7. The individual police officer defendants sometimes frame this claim more broadly, referring to the "allegations of a conspiracy to deprive a person of a constitutional right," *see* Individual Police Officers' Br. at 27, but it is reasonably clear that they are referring to this alleged conspiracy, *see id.* at 13.

8. At oral argument, counsel for *amicus* PBA asserted that the claim of denial of access to the courts was before us because, in the motion to dismiss filed by the individual police officer defendants, the qualified immunity de-

fense was asserted as to all the federal claims. It is true that the defendants' memorandum of law in support of their motion to dismiss stated that "all of the plaintiffs' federal claims against any Individual Police Officer Defendant must be dismissed on the ground of qualified immunity." Def.'s Mem. at 22. But it went on to refer only to "the case law as set out . . . in Point I [entitled 'Plaintiffs' Section 1983 Claims Regarding the Pre–Accident Police Officer Defendants Must Be Dismissed'],'' and argued only that there was no precedent

discussion of qualified immunity, accordingly focused exclusively on plaintiffs' state-created-danger claim. *See Small,* 274 F.Supp.2d at 281. Therefore, only the state-created-danger claims, which have been brought against the "pre-accident" individual defendants, are before us on appeal from the denial of the motion to dismiss insofar as it was based on qualified immunity.[9] Allegations as to the actions of the "post-accident" individual defendants are not relevant to this appeal.

■ "When, as here, the district court resolves a qualified immunity issue on a motion to dismiss, we review the court's determination *de novo,* accept as true all the material allegations of the complaint, and draw all reasonable inferences in the plaintiff's favor." *Anderson,* 317 F.3d at 197.

II. Qualified Immunity: Do Plaintiffs Allege a Constitutional Violation?

■ A claim of qualified immunity ordinarily involves a two-step inquiry. First, the court must answer "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "[I]f a violation could

be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.*[10]

A. *"State Created Danger" Violations of Substantive Due Process*

The Due Process Clause provides, "[N]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. It has been read "to guarantee more than fair process ... and to cover a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis,* 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (internal quotation marks and citations omitted).

■ The plaintiffs concede that Grey was acting in his personal capacity and was therefore not a state actor acting under "color of law" for purposes of 42 U.S.C. § 1983 at the time he caused the deaths of the victims. Therefore, in order to proceed, the plaintiffs must demonstrate that they are not subject to the rule enunciated in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989),

for holding officers liable for private acts of violence. *Id.* There is no discussion of the post-accident denial of access to courts claim. The district court was therefore correct to consider only the state-created-danger claim arising from the pre-accident conduct of police officers in discussing qualified immunity. The post-accident individual officers affected by this issue do not press this argument on appeal.

9. Accordingly, we will not consider the two points raised only by the PBA regarding qualified immunity as to denial of access to the courts and the related claim as to pendent jurisdiction (because the state claims that the PBA seeks to have dismissed involve "ob-

struction of justice" and are therefore related only to the federal denial of court access claim). Nor will we consider the claim of qualified immunity for the "post-accident" police officers as to the § 1983 conspiracy claim associated with the denial of access to the courts.

10. *But see Ehrlich v. Town of Glastonbury,* 348 F.3d 48, 57 (2d Cir.2003) (noting that there may be "circumstances unforeseen in *Saucier* [that] ma[k]e application of sequential analysis to qualified immunity claims either impractical or impossible"). We perceive no obstacles to prevent us from applying *Saucier's* sequential analysis in this case.

that "a State's failure to protect an individual against private violence simply does not constitute ·a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. 998.

In *Dwares v. City of New York,* 985 F.2d 94 (2d Cir.1993), we read *DeShaney*

> to imply that, though an allegation simply that police officers had failed to act upon reports of past violence would not implicate the victim's rights under the Due Process Clause, an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate those rights.

*Id.* at 99. The plaintiff in *Dwares* was a participant in a political rally in New York's Washington Square Park that involved the burning of an American flag. *Id.* at 96. He had allegedly been assaulted by "skinheads" as a result. *Id.* The plaintiff alleged that police officers who were present at the time had indicated to the skinheads in advance that the police would not ·interfere with the assaults nor arrest those responsible for them. *Id.* at 96–97. We thought *DeShaney* to be distinguishable because the complaint "went well beyond allegations that the defendant officers merely stood by and did nothing." *Id.* at 99.

█ The *Dwares* plaintiffs alleged in their complaint that "the officers had in effect aided and abetted the deprivation of [the plaintiff]'s civil rights by allowing him to be subjected to the prolonged assault in

their presence without interfering with the attack." *Id.* We concluded that "[s]uch a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause." *Id.* We thus recognized a version of what has been referred to (although not by us) as the state-created-danger theory. *See, e.g., Kennedy v. City of Ridgefield,* 411 F.3d 1134, 1142 (9th Cir.2005); *Vélez– Díaz v. Vega–Irizarry,* 421 F.3d 71, 80 (1st Cir.2005). We have been joined by a majority of our sister circuits in recognizing that a state created danger can be the basis of a substantive due process violation,[11] but in various courts the term "state created danger" can refer to a wide range of disparate fact patterns. For example, courts· have used the "state created danger" label to describe the state's duty to protect a person from private violence when the state itself has placed that person at risk. "If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir. 1982) (Posner, J.).

Similarly, when it first recognized the state-created-danger theory, the Ninth Circuit, in *Wood v. Ostrander,* 879 F.2d 583, 589–90 (9th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305

---

11. *See, e.g., Forrester v. Bass,* 397 F.3d 1047, 1057–58 (8th Cir.), *cert. denied,* —— U.S. ——, 126 S.Ct. 363, 163 L.Ed.2d 70 (2005); *Butera v. District of Columbia,* 235 F.3d 637, 648–51 (D.C.Cir.2001); *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066–67 (6th Cir.1998); *Kneipp v. Tedder,* 95 F.3d 1199, 1205 (3d Cir.1996); *Uhlrig v. Harder,* 64 F.3d 567, 572 (10th Cir.1995), *cert. denied,* 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996); *Reed v. Gardner,* 986 F.2d 1122, 1125–26 (7th Cir. 1993), *cert. denied,* 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993); *Cornelius v.* *Town of Highland Lake,* 880 F.2d 348, 356 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990), *overruled on other grounds by White v. Lemacks,* 183 F.3d 1253, 1256 (11th Cir.1999); *Wood v. Ostrander,* 879 F.2d 583, 589–90 (9th Cir. 1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); *see also Vélez– Díaz,* 421 F.3d at 80 ("This court has, to date, discussed the state created danger theory, but never found it actionable on the facts alleged." (internal quotation marks and citation omitted)).

(1990), addressed a complaint filed by a woman who was raped by a stranger after police had left her abandoned on the side of the road. The court declared that the fact that the police "stranded Wood in a high-crime area at 2:30 a.m. distinguishes Wood from the general public and triggers a duty of the police to afford her some measure of peace and safety." *Wood*, 879 F.2d at 590. This sort of state-created-danger case seems to rely on the existence of a special relationship between the state and the victim. Some courts have, indeed, incorporated the "special relationship" criterion as a prerequisite to liability.[12]

■ We, by contrast, treat special relationships and state created dangers as separate and distinct theories of liability. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir.1993). In *Dwares*, the state did not breach its duty to protect someone with whom it had a special relationship. Instead, the state itself facilitated and encouraged the private attack at issue, thus creating the danger. In *Ying Jing Gan*, we therefore placed *Dwares* in the same category as an Eighth Circuit case where a police chief instructed subordinates to ignore victim's pleas for protection from her husband, who was the chief's friend, and an Eleventh Circuit case where a town clerk was abducted by a prison inmate whom the government used for

work on town hall grounds. *See id.* at 533–34 (citing *Freeman v. Ferguson*, 911 F.2d 52, 54 (8th Cir.1990) and *Cornelius v. Town of Highland Lake*, 880 F.2d 348, 356–59 (11th Cir.1989),[13] *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990)); *see also Vélez–Díaz*, 421 F.3d at 79 ("In such scenarios, the government officials and the private actor are essentially joint tortfeasors, and therefore, may incur shared constitutional responsibility." (internal quotation marks and citation omitted)). Our distinction between these categories of cases suggests that "special relationship" liability arises from the relationship between the state and a particular victim, whereas "state created danger" liability arises from the relationship between the state and the private assailant. To paraphrase *Bowers*, 686 F.2d at 618, the police officers in *Dwares* did not bring the victim to the snakes; they let loose the snakes upon the victim.

In applying our "state created danger" principle, we have sought to tread a fine line between conduct that is "passive" as in *DeShaney* and that which is "affirmative" as in *Dwares*. In *Hemphill v. Schott*, 141 F.3d 412 (2d Cir.1998), for example, we concluded that the Due Process Clause could be violated when officers who were called to the scene of a drugstore robbery had allowed the store's manager to join them in pursuit of the suspect and then

---

**12.** For example, the Fifth Circuit has confined liability to situations involving "special relationships described by the Supreme Court [in *DeShaney*], which are limited to cases concerning 'incarceration, institutionalization, or other similar restraint of personal liberty.'" *Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir.2004) (citing *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998). The First Circuit has interpreted this view as a "flat[ ] reject[ion of] the 'state-created danger' theory of liability." *Vélez–Díaz*, 421 F.3d at 80. The Sixth Circuit has indicated that a special relationship is necessary to distinguish risks of harm to a specific victim from risks of harm to the pub-

lic at large, *see Kallstrom*, 136 F.3d at 1066. The Third Circuit has at times required a special relationship, *see Mark v. Borough of Hatboro*, 51 F.3d 1137, 1153 (3d Cir.1995), *cert. denied*, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995), but may now interpret the requirement so narrowly as to render it toothless, *see Kneipp*, 95 F.3d at 1209 n. 22.

**13.** Even though the Eleventh Circuit analyzed *Cornelius* as a special-relationship case, *Ying Jing Gan* effectively recharacterized it as a *Dwares*-like state-created-danger case. *See Ying Jing Gan*, 996 F.2d at 533–34.

returned a gun to the manager, who then used it to shoot the plaintiff. *Id.* at 418–20. In *Pitchell v. Callan*, 13 F.3d 545 (2d Cir.1994), by contrast, we could discern no constitutional violation when an off-duty police officer did no more than fail to stop another off-duty police officer from shooting a houseguest. *Id.* at 549.

Although we have not previously addressed a state-created-danger claim based on drunk driving, the Seventh Circuit has adopted a similar approach in that context, distinguishing between passive failure to stop private violence and its active facilitation. *Compare Reed v. Gardner*, 986 F.2d 1122 (7th Cir.1993) (due-process violation when police left an intoxicated passenger in the car with the ignition keys), *with Latuszkin v. City of Chicago*, 250 F.3d 502 (7th Cir.2001) (no due-process violation for failure to stop an off-duty police officer from driving home drunk from a party).

Distinguishing between "active" and "passive" facilitation can of course sometimes be difficult. In *Dwares* the police officers explicitly told the skinheads they would not interfere and gave "prearranged official sanction" to the private violence. *Dwares*, 985 F.2d at 99. But *Dwares* left open the question whether repeated inaction by government officials over a sustained period of time, without explicit advance approval or encouragement of the misbehavior in question, might effectively constitute an implicit "prior assurance" rising to the level of an affirmative act. *Dwares* also did not indicate whether government officials might implicitly send a message of official sanction by engaging in related misconduct themselves.

■ It is clear from the cases, we think, that to the extent that the plaintiffs allege merely that the individual defendants failed to intercede on the day of the accident, their complaints do not involve sufficient affirmative acts to violate substantive due process rights. Similarly, to the extent that the plaintiffs allege that Grey's supervisors "stood by and did nothing" to punish Grey's previous misconduct, we think those allegations are also inadequate to state a substantive due process claim.[14] A failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a state *created* danger. Under *DeShaney*, "allegations that the defendant officers merely stood by and did nothing" are insufficient to state a constitutional violation. *Dwares*, 985 F.2d at 99.

■ There is, however, another set of allegations stated in the Pena Complaint—and less clearly in the Herrera Complaint—that the defendants communicated to Grey that he was free to drink to excess and drive in that condition. According to the Pena complaint, Grey and other police officers were "encouraged[15] to inappropriately and excessively drink alcohol while on and off-duty."[16] Pena Compl. ¶ 53.

---

14. Plaintiffs' counsel recognized at oral argument that simply "permitting" alcohol-related misconduct may fall on the *DeShaney* side of the *DeShaney/Dwares* line. Oral Arg. Tr., Dec. 2, 2004, at 29.

15. The complaint states that this encouragement was "explicit[] and implicit[]," Pena Compl. ¶ 53, but nothing in the text of the complaint supports the conclusory charge of *explicit* encouragement. Rather, the allegations suggest that the supervisors gave implic-

it encouragement by participating in the drinking themselves or allowing it to continue.

16. The Herrera Complaint alleges in its "Factual and General Allegations" section that, prior to August 4, 2001, Grey and other officers "consumed alcoholic beverages in the 72nd Precinct parking lot with the knowledge of ... sergeants and other police department supervisory personnel" and with their "per-

"This encouragement came from supervisory personnel, such as, defendant Sergeant Keith Singer and Sergeant Dennis Healy, and others, who, prior to August 4, 2001, routinely drank with defendant Grey and others in the 72nd Precinct parking lot, in violation of the laws of the State of New York." *Id.* ¶ 54. Moreover, on the day of the incident, Pena alleges: (1) several of the defendants, including Sergeants Singer and Healy, drank alcoholic beverages with Grey in the 72nd Precinct parking lot; (2) some of the defendants, including Healy, drove to The Wild, Wild West—Healy being driven by Grey himself—and continued to drink there with Grey; and (3) Healy asked Grey to drive him back to the precinct house. *Id.* ¶¶ 16, 57–63.[17] The plaintiffs also assert that those supervisory officers who did not participate in the drinking nonetheless communicated their approval by condoning the misconduct.

As the plaintiffs' counsel recognized at oral argument before us, the key question is whether the individual defendants told, or otherwise communicated to, Officer Grey that he could drink excessively and drive while intoxicated without fear of punishment. The plaintiffs argue that a reasonable factfinder could infer that the defendants' behavior constituted an implicit prior assurance to Grey that he could drink and drive with impunity. We agree that to the extent that fellow police officers and some supervisors participated in or condoned Grey's behavior, and even—in Healy's case—invited Grey to drive after drinking heavily, it could be inferred by a reasonable juror that those defendants, by their actions, implicitly but affirmatively condoned Grey's behavior and indicated to Grey that he would not be disciplined for his conduct.[18]

The defendants emphasize that the officers who drank with Grey were themselves off-duty at the time. But the fact that an officer is off-duty does not prevent him or her from giving assurances about what he or she or other police officers will or will not do when acting as police officers. The relationship between the on– and off– duty police officer defendants with off-duty police officer Grey surely provided them with the opportunity to communicate their encouragement and approval of his behavior. While it may be more difficult for the plaintiffs to prove that the off-duty officers communicated official sanction of Grey's conduct, it does not negate, as a matter of law, the possibility of such a communication.

We conclude that when, as the plaintiffs allege, state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct under *Dwares.* This is so even though none of the defendants are alleged to have communicated the approval explicitly.[19]

---

*mission and consent."* Herrera Compl. ¶¶ 24, 26 (emphasis added).

**17.** The Herrera Complaint refers to the same events but does not specifically name any of the defendants other than Healy in reference to the drinking at The Wild, Wild West. Herrera Compl. ¶¶ 22–23, 30–31.

**18.** We note, however, that the inference of official sanction is weaker as to the officers who drank with Grey only for a few hours in the precinct parking lot, and stronger as to those who then drove with him to the bar—and particularly as to Sergeant Healy, who asked Grey to drive him back to the precinct after drinking at the bar.

**19.** The plaintiffs seek also to assert a broader "systemic claim" in their complaints. Herrera Compl. ¶¶ 68–73; Pena Compl. ¶¶ 120–41.

We emphasize that the type of claim we understand the plaintiffs to assert is based on more than a failure to prevent misbehavior and to reprimand or punish the miscreants. The plaintiffs assert that prior assurances of impunity were actually, albeit implicitly, communicated. *Cf.* Fed. R.Evid. 801 advisory committee notes (*nonverbal conduct may qualify as a "statement"* for purpose of hearsay rules); *Lee v. Bankers Trust Co.*, 166 F.3d 540, 546 (2d Cir.1999) (defamation claim) ("Most authorities recognize that actions may indeed be statements . . . . *See* Restatement (Second) of Torts § 566."). Sometimes deliberate silence is equivalent to explicit permission. Whether such silence in this particular case—or in future cases—did in fact communicate permission is a factual determination which we decline to resolve on a 12(b)(6) motion to dismiss. Plaintiffs have stated a claim upon which relief can be granted.

B. *"Shock[ing] the Contemporary Conscience"*

 In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n. 8, 118 S.Ct. 1708.[20] *Lewis* reaffirmed the principle that the Four-

teenth Amendment is not a "font of tort law." *Id.* at 848, 118 S.Ct. 1708. It does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable. The *Lewis* Court made it clear, for example, that "negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* at 849, 118 S.Ct. 1708.

We did not, in *Dwares*, explicitly ask whether the officers' conduct there in issue "shocked the conscience." We did, however, note that the complaint before the court made "sufficient factual allegations from which a factfinder could infer *intentional* discrimination." *Dwares*, 985 F.2d at 99 (emphasis added); *see also id.* ("Proof of an agreement by defendant officers with 'skinheads' expressly to permit flag burners to be beaten up without official interference or reprisal, and of a failure by the officers to interrupt such beatings inflicted in their presence, would easily permit the finder of fact to infer that the officers *intended* the flag burners *qua* flag burners to suffer the injuries inflicted." (emphasis added)). If the question had been asked explicitly, we think that we would have answered that such intentional infliction of injury would shock even the least sensitive of contemporary consciences.

 Having decided that the *Dwares* state-created-danger principle extends to

---

We find it difficult to discern from the language of the complaint what the intended scope of the allegations is, or even whether it includes allegations against individual defendants (who alone can assert qualified immunity, *see Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)). Assuming, although we think it is far from clear from the face of the complaints, that the allegations accuse the individual defendants of having participated in the policies and customs that sanctioned Grey's misconduct, such allegations seem to us to be similar enough to

the others asserting implicit prior approval of Grey's behavior to state a claim of state created danger under section 1983.

20. "While the measure of what is conscience shocking is no calibrated yard stick, it does, as Judge Friendly put it, 'point the way.'" *Lewis*, 523 U.S. at 847, 118 S.Ct. 1708 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)) (alteration marks omitted).

implicit prior assurances by police officers of impunity for drunken driving, we must now determine whether those implicit assurances must be made with *Dwares*-like specific intent to cause injury.[21] Determining whether the conscience is shocked by lesser levels of culpability than intentional infliction of physical harm requires us to make "closer calls." *Lewis*, 523 U.S. at 849, 118 S.Ct. 1708. In the context of action by a law enforcement official during a high-speed chase, as in *Lewis*, or a hostage situation, as in *Medeiros v. O'Connell*, 150 F.3d 164 (2d Cir.1998), "an intermediate level of fault, such as recklessness, is not enough to impose constitutional liability." *Id.* at 170.

But *Lewis* made it clear that such emergency situations may—perhaps must—be treated differently than those in which time for reflection is possible. In the course of deciding that police conduct during a high-speed chase did not shock the conscience, the *Lewis* Court noted that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850, 118 S.Ct. 1708. In contrast with the typi-

cal police chase, the Court stated, "deliberate indifference" is enough to shock the conscience in prisoner misconduct cases, for example, because of "the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection." *Id.* at 853, 118 S.Ct. 1708. "As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." *Id.* at 851, 118 S.Ct. 1708; *see also Scheeler v. City of St. Cloud*, 402 F.3d 826, 831 (8th Cir.2005) ("This determination turns on whether the state actor had the opportunity to deliberate before selecting a course of conduct; if so, the plaintiff may prevail where the actor was deliberately indifferent to a fundamental right held by the plaintiff."); *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir.2005) ("In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.' ").[22]

The case before us does not involve a chase of a suspect or a prison riot where we must "capture the importance of [state officials'] competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently

**21.** In *Hemphill*, we noted in passing that "[o]ur decision in *Dwares* establishes that the [o]fficers' subjective motivations ... do bear upon our determination whether the [o]fficers should be entitled to summary judgment." *Hemphill*, 141 F.3d at 419.

**22.** *Lewis* also indicated that less culpable mental states may more easily shock the conscience when the victim is in state custody. *See Schroder v. City of Fort Thomas*, 412 F.3d 724 (6th Cir.2005); *Smith v. District of Columbia*, 413 F.3d 86, 93 (D.C.Cir.2005). Whether or not a victim was in state custody will surely be relevant to the state's duty to protect. But because this Circuit treats the

"state created danger" exception as distinct from the "special relationship" exception, the fact that the victims were not in state custody at the time of the accident is irrelevant here. In *Dwares* we concluded that the complaint successfully asserted a substantive due process claim against the defendants even though the plaintiffs were not in any sense in custody or otherwise restrained at the time of the defendants' allegedly unconstitutional acts. The government is culpable for this "state created danger" because of its encouragement of the assailant, not its special relationship with the victim. *See* Section II.A of the "Discussion" section of this opinion, above.

without the luxury of a second chance." *Lewis*, 523 U.S. at 852, 118 S.Ct. 1708 (quoting *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)) (internal quotation marks omitted). Not condoning egregious drunk driving "does not ordinarily clash with other equally important governmental responsibilities." *Id.* (quoting *Whitley*, 475 U.S. at 320, 106 S.Ct. 1078).

The defendants here, on the facts as alleged, had ample opportunity, not only during the day in question, but also during the days, weeks and months that preceded it, in which to decide what to do and say in response to the alleged practice of drinking and driving by off-duty officers. Nor does it require a sophisticated exercise in judicial notice for us to acknowledge that the extreme danger of drinking and driving is widely known.

We conclude that the alleged behavior of the pre-accident individual defendants here, over an extended period of time and in the face of action that presented obvious risk of severe consequences and extreme danger, falls within the realm of behavior that "can properly be characterized as . . . conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847, 118 S.Ct. 1708 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). To paraphrase the *Lewis* Court, if the plaintiffs' allegations are accurate, it was not only feasible, it was obligatory, for the defendants to avoid tacitly encouraging Grey's behavior. *See id.* at 851, 118 S.Ct. 1708.

Accordingly, we think that the allegations in the complaints before us, even if they do not accuse the defendants of acting with specific intent or desire to cause physical injury, are sufficient to assert that the defendants created a serious danger by acting with deliberate indifference to it. Whether termed "deliberate indifference"

or "recklessness," this mental state is sufficient to establish liability in such cases "because it requires proof that the defendant focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk." *Woodward v. City of Worland*, 977 F.2d 1392, 1399 n. 11 (10th Cir.1992), *cert. denied*, 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993); *accord Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir.1988) (en banc) ("[R]eckless disregard of a great risk is a form of knowledge or intent"), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989). Having determined that such extreme recklessness as has been pleaded would, if proved, state a claim (but, as discussed below, that the defendants are entitled to qualified immunity), we need not and do not undertake to proffer formal guidelines as to what other actions in other circumstances might be subject to a similar substantive due process claim.

### III. Qualified Immunity: Was the Constitutional Right Clearly Established?

█ Having concluded that the plaintiffs have alleged a violation of a constitutional right, in order to decide whether the defendants are entitled to qualified immunity, we must determine whether that right was clearly established at the time of the defendants' behavior in issue. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. "The relevant, dispositive inquiry in determining whether a [federal] right is clearly established is whether it would [have] be[en] clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

█ This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201, 121 S.Ct. 2151. Nonetheless, "officials can still be on notice that their

conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). The essence of the principle is that "[o]fficers sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants charged with [a] criminal offense." *Id.* at 739, 122 S.Ct. 2508. In assessing a qualified immunity claim, we consider in particular:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 129–30 (2d Cir. 2004) (quoting *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992)).

Although it is a close question, we think that the substantive due process violation that the plaintiffs allege here was not clearly established for purposes of qualified immunity. *Dwares* did not address, let alone decide, whether repeated inaction on the part of government officials over a long period of time without an explicit statement of approval, might effectively constitute such an implicit "prior assurance" that it rises to the level of an affirmative act. *Dwares* also did not indicate whether government officials may implicitly send a message of official sanction by engaging in related misconduct themselves or by participating in or tolerating such a practice. And *Dwares* did not ex-

pressly address the question of the scienter required for section 1983 liability. The rule of law that we draw from *Dwares* today was not "clearly established" at the time of the conduct in question here.[23] We therefore conclude that the pre-accident individual defendants are entitled to qualified immunity as to the substantive due process claims. Insofar as the complaints alleged such substantive due process violations against them, they should have been dismissed.

## CONCLUSION

We therefore vacate the district court's denial of the motion to dismiss the state-created-danger claims as to the individual defendants on the basis of qualified immunity and remand with instructions for the district court to grant the motion to that extent.

---

**23.** That a state actor's explicit encouragement of drunk driving with the intent of harming pedestrians is actionable under the state— created-danger theory was doubtless clearly established by *Dwares,* but no such behavior is suggested here.