RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0078p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

HANY F. KOULTA, Personal Representative of the
Estate of SAMI F. KOULTA,

*Plaintiff-Appellee,*

*v.*

No. 06-1539

OFFICER DANIEL MERCIEZ; OFFICER ROBERT
WROBLEWSKI; and OFFICER STEVEN HILLA,

*Defendants-Appellants,*

CITY OF CENTER LINE,

*Defendant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 04-40343—Paul V. Gadola, District Judge.

Argued: February 1, 2007

Decided and Filed: February 26, 2007

Before: SUHRHEINRICH, SUTTON and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Julie McCann O'Connor, O'CONNOR, DeGRAZIA, TAMM & O'CONNOR,
Bloomfield Hills, Michigan, for Appellants. Iris E. Rubin, RUBIN & RUBIN, Farmington Hills,
Michigan, for Appellee. **ON BRIEF:** Julie McCann O'Connor, O'CONNOR, DeGRAZIA, TAMM
& O'CONNOR, Bloomfield Hills, Michigan, for Appellants. Iris E. Rubin, RUBIN & RUBIN,
Farmington Hills, Michigan, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. Shortly before 3:00 a.m. on September 13, 2002, Chrissy Lucero
drove her 1991 Buick through a red light at 63 miles per hour and broadsided Sami Koulta's 1998
Honda. Koulta died from the collision. No one doubts Lucero's responsibility for the accident: She
was intoxicated; she was speeding; and she had just run a red light. And no one doubts the utter
misfortune that befell Koulta and his family that night. The police charged Lucero with second-
degree murder, to which she pleaded guilty, and she is currently serving a well-deserved sentence

1

for the crime. Koulta's estate also filed a civil action against Lucero and obtained a $750,000 judgment against her.

The question here is one of secondary liability. After learning that several police officers employed by the City of Center Line had confronted Lucero minutes prior to the accident, Koulta's estate filed this § 1983 claim against the officers and the city, alleging that they had violated Koulta's substantive due process rights by permitting the inebriated Lucero to continue to drive. Where a claimant accuses government officials of failing to prevent one private party from injuring another, *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), and its progeny seldom permit the claim to proceed. This case does not fall within any of the limited exceptions to the rule. Because the officers' actions did not create or increase the risk that an innocent victim would be killed by Lucero's drunken driving and because the officers' actions in dealing with Lucero did not specially place Koulta at risk, our precedents require us to reject this claim as a matter of law.

I.

As with many claims of this type, this one involves equal doses of private-party foolishness, governmental incompetence (assuming, as we must, the truth of the allegations) and public anguish. On September 12, 2002, Lucero went to the house of her ex-boyfriend Frank Offrink, hoping to reconcile with him. When Offrink did not return, Lucero left the house to purchase a "40 of Bud Ice," JA 165, then returned and "started drinking[,] . . . drinking pretty fast," *id*. After feeling "a little buzzed," *id*., Lucero drove to a "7-Eleven" and purchased a 40-ounce bottle of "Colt 45," *id*. She returned to Offrink's house and started drinking the second 40-ounce bottle. She tried to reach Offrink on his cell phone but had no luck. Thoroughly "pissed off," *id*., Lucero got in her car, "took [a] Paxil," an anti-depressant, "with the rest of the 40," *id*., threw the bottle "out the window," JA 166, and drove to the house of Offrink's best friend. Offrink was not there, so Lucero drove back to his house.

At this time (by now the early morning hours of September 13), Offrink's mother, Frances, refused to allow Lucero to enter the house again. Undeterred, Lucero "knocked constantly" on the door, then "tried to climb up the trellis . . . into [Frances'] bedroom window." JA 167. In response, Frances called the Center Line (Michigan) Police Department to report Lucero as an "unwanted" person on her property. JA 72. Three Center Line police officers—Daniel Merciez, Robert Wroblewski and Steven Hilla—responded to the call.

When the officers arrived at the Offrink's house between 2:15 and 2:20 a.m., they saw Lucero's vehicle in the driveway. After checking the license plate, Officer Merciez learned that it was expired. The officers questioned Frances and Lucero. Frances maintained that she wanted Lucero removed from her property; Lucero explained that she hoped to reconcile with her ex-boyfriend and says that she told the officers she had drunk a 40-ounce bottle of malt liquor. (She did not tell them about the 40-ounce bottle of "Bud Ice" or the Paxil.)

The officers ordered Lucero to leave the premises. In doing so, they did not cite her for having expired license plates, did not conduct any investigation into her driving record and did not administer a sobriety test. As far as the police were concerned, she needed to just "get over it," "go home" and accept the fact that Frank was "with somebody else." JA 168. Lucero told the officers she would leave and entered her car. Satisfied, the officers left. While driving away, however, they noticed that Lucero remained in the driveway. One of the officers made a U-turn, returned to the driveway and informed Lucero that she had "10 seconds to get out of [t]here." JA 169. Lucero left.

She drove from the Offrink's house in Center Line in the direction of the neighboring city of Sterling Heights. At 2:35 a.m., a dozen minutes or so after speaking for the last time with the

police, Lucero crashed into Sami Koulta's vehicle, killing him instantly. Within minutes of the collision, an officer with the Sterling Heights Police Department arrived on the scene. The officer observed that Lucero smelled strongly of alcohol, slurred her speech, had red, watery eyes and had urinated on herself. Tests confirmed that Lucero's blood alcohol level was 0.11, which was .01 over the then-legal limit.

Prosecutors charged Lucero with second-degree murder. She pleaded guilty and is currently incarcerated. Koulta's estate filed a civil action against Lucero and obtained a $750,000 judgment.

Koulta's estate filed a number of other suits, including a complaint in federal district court against the city and the three officers. The federal-court complaint raised several federal and state claims, including a § 1983 claim based on the violation of Koulta's substantive due process rights. While the district court declined to exercise supplemental jurisdiction over the state-law claims, it concluded, in denying the defendants' motion for summary judgment, that the claimant had established a prima facie case of substantive-due-process liability and that the claimant's constitutional rights were clearly established.

## II.

Qualified immunity shields police officers from claims of this sort unless (1) they violated a "constitutional right" that (2) "was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We "must" address the "initial inquiry," the Supreme Court has instructed, before we may reach the "clearly established" question. *Id*.

## A.

The Due Process Clause does not "require[] the State to protect the life, liberty, and property of its citizens against invasion by private actors," *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989), except in two situations—one recognized by *DeShaney*, the other recognized by our court. Under the *DeShaney* exception: "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id*. at 199–200. Under our exception: When the State "cause[s] or greatly increase[s] the risk of harm to its citizens . . . through its own affirmative acts," it has established a "special danger" and a corresponding duty to protect its citizens from that risk. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). An individual wishing to bring a claim under this second exception, what has come to be known as a "state-created danger" claim, must show three things: "'(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.'" *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)).

Koulta's estate cannot bring this claim under the *DeShaney* exception. The officers never placed Koulta in protective custody or otherwise restrained his liberty to the point where he could not take care of himself.

Nor, for the reasons that follow, can Koulta's estate satisfy the requirements for bringing a state-created-danger claim.

1.

The estate, to begin, cannot satisfy the "affirmative act" requirement. Under this inquiry, an officer's failure to act will not satisfy the test but an officer's affirmative acts may satisfy it. Because it is sometimes difficult to distinguish action from inaction—does, for example, an officer's decision to permit someone he knows to have been drinking to continue driving without administering a breathalyzer test fall on one side of the line or the other?—we have refined the test. Rather than focusing on the often metaphysical question of whether officer behavior amounts to affirmative conduct or not, we have focused on "whether [the victim] was safer before the state action than he was after it." *Cartwright*, 336 F.3d at 493. If the claimant thus cannot identify conduct "by the state which either created or increased the risk" of harm to which Koulta was exposed, *Jones*, 438 F.3d at 690; *see Kallstrom*, 136 F.3d at 1066, our precedents instruct us to consider the officers' "conduct as 'falling on the inaction side of the line.'" *Jones*, 438 F.3d at 692 (quoting *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003)) (brackets omitted); *see also May v. Franklin County Comm'rs*, 437 F.3d 579, 586 (6th Cir. 2006); *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 467 (6th Cir. 2006); *Jackson v. Schultz*, 429 F.3d 586, 591–92 (6th Cir. 2005); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065–66 (6th Cir. 1994).

The risk of harm in this case was that Lucero's drinking and driving would injure someone. As a matter of law, Koulta's estate has failed to show that the officers "created" or "increased" that risk. Before they arrived on the scene, Lucero (by her own admission) already had gotten in her car four times to drive after she got a "little buzzed" from the first 40-ounce beer she consumed, JA 165: once to drive to the store to get the second 40-ounce beer; once to drive back to the Offrink's house after buying the beer; once to drive to the house of a friend of Frank Offrink's, all while finishing the second 40-ounce beer, throwing the empty bottle out the window and taking a Paxil; and once more to return to the Offrink's house. On this record, the officers did not "create" or "increase" the risk that Lucero would drink and drive. Lucero's proclivity to engage in risky, and illegal, behavior had blossomed long before the officers arrived on the scene.

The officers' failure to administer a breathalyzer test (or otherwise to determine the extent of Lucero's drinking) before ordering her to leave the property may well have been negligent, but it did not "create" or "increase" the danger—of Lucero drinking and driving—that pre-dated their arrival on the scene. The same is true of the officers' decision to order Lucero to leave the property. Consistent with the homeowner's understandable request, the officers told Lucero to "go home" when they arrived at the Offrink's home, JA 168, and, when Lucero did not leave after saying she would, they ordered her to leave the property immediately. The claimant cannot maintain that Lucero never would have been drinking and driving that night but for the officers' conduct—given her acknowledged behavior before they arrived. And the claimant cannot maintain that Lucero would not have driven to the scene of the accident but for the officers' conduct. As Lucero acknowledges, the officers told her to "go home" when they first arrived and later ordered her to leave the property. Neither directive *required* Lucero to drive home if she lacked the capacity to do so. Nothing prevented her either (1) from driving down the block, then calling a cab or waiting to drive the rest of the way home after becoming sober or (2) from asking the officers for assistance in getting home.

In the final analysis, Lucero's admitted proclivity to drink and drive that evening placed Koulta (and other people using the roadways) in as much danger before the officers arrived as afterwards. And much as the officers were in a position to head off the tragedy that materialized minutes later, a reality (and memory) that no court decision will eliminate, their conduct was no more an affirmative risk-creating act than the conduct of the officers in *DeShaney* (who returned an abused child to the custody of his abusive father) or *Bukowski* (who returned a mentally disabled girl to the stranger who had been sexually abusing her).

Neither *Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005), nor *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), undermines this conclusion. In *Pena*, the Second Circuit held that the claimant satisfied the affirmative-act requirement by showing that an off-duty officer's colleagues both condoned his excessive drinking and driving throughout the course of a day and asked for rides from him. *See* 432 F.3d at 111. There, unlike here, the on-duty officers increased the driver's level of impairment (by condoning his drinking) and increased the risk that he would drive while impaired (by requesting rides from him). In *Reed*, the Seventh Circuit held that the claimant satisfied the requirement when officers arrested a sober driver, took her into custody and left the keys with her visibly drunk husband. *See* 986 F.2d at 1126. There, unlike here, the risk that the husband would drive while drunk did not exist until the officers took the wife into custody and prevented her from continuing to drive the car. Both cases exhibit the sort of intervening affirmative act—creating a risk of harm in the one case (*Reed*) and exacerbating it in the other (*Pena*)—that our state-created-danger cases require.

2.

Even if there were doubt about this point, our cases leave little room for doubt about the claimant's inability to satisfy the "special danger" requirement, which required it to show that "the state's actions placed [Koulta] specifically at risk, as distinguished from a risk that affects the public at large." *Jones*, 438 F.3d at 690; *see Kallstrom*, 136 F.3d at 1066. In the past, we have noted, claimants have satisfied this requirement when "the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims." *Jones*, 438 F.3d at 696; *see Caldwell v. City of Louisville*, 120 F. App'x 566, 573 (6th Cir. Dec. 9, 2004); *Waller v. Trippett*, 49 F. App'x 45, 50 (6th Cir. Oct. 10, 2002); *Kallstrom*, 136 F.3d at 1067. When, by contrast, "the victim was not identifiable at the time of the alleged state action/inaction," we have rejected the claim. *Jones*, 438 F.3d at 697; *see Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005) (rejecting claim by mother on behalf of her son killed by a car traveling over the speed limit because city's failure either to enforce the existing speed limit on a neighborhood street or to lower it did not put a discrete group of people at risk).

This case falls into the second category. Koulta was exposed to a risk that affected the public at large, not a discrete group of individuals. Lucero's behavior endangered every driver and passenger on the road that evening, and Koulta was the unlucky driver who happened to be in the wrong place at the wrong time. Nor can the estate overcome this impediment by contending that Koulta was a member of a more discrete group—of individuals driving on the streets between Frank's house and Lucero's house in the early hours of September 13. We have no idea how many people would be in that group, and the claimant offers no help in explaining why this group is sufficiently discrete to satisfy this requirement.

Attempting to analogize this fact pattern to *McQueen v. Beecher Community Schools*, 433 F.3d 460 (6th Cir. 2006), the claimant does its case more harm than good. There, school officials left *five* children unattended in a classroom with an armed and dangerous student, and we held that this group was sufficiently discrete to satisfy the requirement. Yet any driver on the road on the evening in question was placed at risk by Lucero's conduct—a far less discrete group than five children and a far less discrete group than, say, the single neighborhood street at issue in *Schroder*. *See Schroder*, 412 F.3d at 729; *Jones v. City of Carlisle*, 3 F.3d 945, 949–50 (6th Cir. 1993).

B.

Even if we assumed for the sake of argument that the officers' actions violated Koulta's substantive due process rights, his estate cannot show that these rights were "clearly established" at the time of the accident. Not just in 2002, but since then as well, our cases have failed to

recognize a "state-created danger" claim unless the State indeed created the danger—either by increasing the risk of harm to third parties by its affirmative conduct or by doing something that endangers a discrete member or group of the public. *See, e.g.*, *Jones*, 438 F.3d at 698; *Schroder*, 412 F.3d at 729. The estate has not identified a case from our circuit or any other that clearly establishes the contours of a substantive-due-process right of action on facts like these.

III.

For these reasons, we reverse.