Evarista GARCIA, Individually and on behalf of her Minor Child, Michelle Merino, Plaintiffs,

v.

Larry BROWN, Individually and in his official capacity, Tanya Parson, the City of White Plains, and the White Plains Police Department, Defendants.

No. 05 CIV. 5874(CM).

United States District Court, S.D. New York.

Aug. 2, 2006.

Michael Howard Joseph, Osorio & Associates LLC, White Plains, NY, for Plaintiffs.

Joseph Anthony Maria, Joseph A. Maria, P.C., White Plains, NY, for Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

On July 26, 2004, Plaintiffs Evarista Garcia and her daughter Michelle Merino, both of whom are of Hispanic origin, were at a park in White Plains, New York.

During the course of that evening, Garcia was twice approached by a group of African–American women. The first time, eight young women, aged twelve to sixteen, cursed at and spit upon Garcia. After this first incident, Garcia contacted the police. Defendant Police Officer Larry Brown arrived at the park and assured Garcia that he would look for the group of youths. However, moments later, when the group returned, along with defendant Tanya Parson, Brown allegedly watched from his squad car as Parson and the younger women surrounded Garcia and her daughter, pulling their hair and hitting them with their hands. Although Brown and other officers eventually intervened, Garcia and Merino suffered injuries as a result of the incident.

On June 24, 2005, Garcia and Merino filed a complaint against Brown, Parson, the City of White Plains, and the White Plains Police Department as defendants, alleging that Parson and Brown had deprived them of their constitutional rights in violation of 42 U.S.C. § 1983 and had conspired to deprive them of their rights under 42 U.S.C. § 1985. In addition, plaintiffs also alleged that the city and police department were negligent in training and supervising their police officers.

The City, Police Department, and Brown now move for summary judgment under Federal Rule of Civil Procedure 56. In addition, Brown has moved for summary judgment on qualified immunity grounds.

For the reasons stated below, defendants' motion is granted in part and denied in part.

### Facts

*Plaintiffs' Account*

On July 26, 2004, at approximately 7:30 p.m., plaintiffs Evarista Garcia ("Garcia") and her six-year old daughter Michelle

Merino ("Merino") were at Kittrell Park in White Plains, New York. Deposition of Evarista Garcia, Defendants' Exhibit H, ("Garcia Deposition") at 16. Garcia and Merino were accompanied by Garcia's husband, Gaspar Merino, her sons, Jasiel and Martin Hernandez, and her nephew, Juan Carlos Garcia. *Id.* The family frequented the park, especially on Sundays and during the summer. *Id.* at 14. Both Garcia and her daughter were of Hispanic descent. Declaration of Evarista Garica, Plaintiffs' Exhibit 4 ("Garcia Declaration") ¶ 5.

While her sons, nephew, and husband were off on their own, Garcia stood and watched as Merino played on the playground. While doing so, she met up with an acquaintance, Maricela Gonzalez, who had also brought her child to the playground. Garcia Deposition at 28.

After about twenty minutes, Merino, who had been playing on the playground with several other children, tearfully approached her mother, explaining that a little boy had spit on her. *Id.* at 29. Garcia went over to the child and told him, "Don't do that." In return, the boy told her, "You're not my mother. I can do whatever I want." *Id.* According to Garcia, she never pushed the boy or raised her voice when talking to him *Id.* at 73,112. The boy, approximately six years old, was African–American and attended school with Merino. *Id.* at 29, 99. Garcia later learned that the boy was defendant Tanya Parson's son.

After Garcia talked with the boy, he left the area, returning a short time later with a group of approximately eight African–American girls, all between the ages of twelve and sixteen years old. *Id.* at 34. The group descended upon Garcia, cursing at her and spitting on her. *Id.* at 34–35. Garcia contacted the police using her cell phone, and, in response, the young boy and the girls left the park. *Id.* at 35–36.

Defendant Police Officer Larry Brown, an African–American male, responded to Garcia's call, arriving at the park shortly after the group had left. *Id.* at 46. When he arrived, Garcia and her family approached his squad car to talk to him about what had just happened. *Id.* at 50. Her son, Jasiel, and her nephew supplied Brown with the names of some of the girls who had been in the group. Brown responded that he knew the people involved, and "that he was going to try to search [for] them." *Id.* at 52. Brown told Garcia that if the group came back, she should "Just push the red button," indicating the park's emergency call station. Garcia Declaration ¶ 8. Brown then left the park.

After Brown left, Garcia went back to the playground with Merino. Garcia Deposition at 53. Within two minutes, the group of youngsters returned to the park. With them was defendant Tanya Parson, an African–American woman. *Id.* at 54–55. As they approached the park, Brown, who was in his squad car, stopped them and talked to them for approximately five minutes. Garcia saw this, but could not hear what was being said. *Id.* at 59–60. After speaking to Parson and the youngsters, Brown made a U-turn, and then stopped his car, facing the park. *Id.* at 61.

Parson and the youngsters then entered the park and began yelling at Garcia. Parson called out, "You are dirty Mexicans. You should go back to your country." *Id.* at 62. As the group approached her, Garcia retreated, entering her car which was parked nearby. Parson and the youths surrounded the car, and Parson asked Garcia to get out so they could discuss what had happened earlier. *Id.* at 74. While Garcia was in the car, she could see that Brown's vehicle was close by, facing her. *Id.* at 67–68.

When Garcia exited her car, Parson began to scream at her. *Id.* at 75. Parson told Garcia, "Don't ever do this to my son." *Id.* at 73. Parson then began to pull Garcia's hair, and she and the youngsters hit her on her head, face, hips, and neck. *Id.* at 76–78. The youngsters also hit Merino at this time, scratching her and pulling her hair. *Id.* at 90.

As Garcia was being attacked, Gonzalez, who was still in the park, noticed that Brown remained in his car across the street, "watching what was happening." Declaration of Maricela Gonzalez, Plaintiffs' Exhibit 5 ("Gonzalez Declaration") ¶ 11. She yelled and waved her arms in an attempt to attract Brown's attention. *Id.* ¶ 9. In addition, Garcia's son pushed the red emergency button, as Brown had told them to do, and her nephew ran to Brown's car, banged on the window and yelled, "They are beating her up." Garcia Deposition at 79–80; *see also* Gonzalez Declaration ¶ 10. Two or three minutes later, Brown went across the street to the park, just as two other officers arrived on the scene. *Id.* at 80. When the police arrived, Parson and the group of youngsters began to run from the park. *Id.* at 81.

As Parson ran from the scene, she was stopped by Brown. At this time, Garcia heard Brown and Parson refer to each other by their first names. *Id.* at 83. Parson continued to yell at Garcia as Brown attempted to calm her down. *Id.* at 85. Parsons was then arrested by Brown and changed with assault, although Garcia did not witness Parson's arrest. *Id.* at 84.

After Garcia and her family talked with the officers at the scene, Garcia's husband drove her and Merino to the hospital. *Id.* at 87. Both mother and daughter were given pain medication, and Garcia was admitted to the emergency room, where x-rays were taken of her head and neck. *Id.* at 90–93.

As a result of the incident, Merino suffered bruising, while Garcia sustained injuries to her neck. Complaint ¶¶ 24–25. Shortly afterwards, Garcia began seeing a chiropractor to treat her neck and back. Garcia Deposition at 103–06. She has continued to visit her chiropractor once every two or three weeks. *Id.* at 106. After July 26, 2004, plaintiffs continued to visit Kittrell Park. *Id.* at 99. Merino has also continued to attend school with Parson's son without any further disputes. *Id.*

*Defendants' Account*

Defendants' version of events differs considerably from plaintiffs'. According to Brown, he first arrived at the park in response to a radio dispatch indicating that there had been some sort of altercation. Deposition of Larry Brown, Defendants' Exhibit G ("Brown Deposition") at 15. After speaking with Garcia, he expressed his intention to search for the youngsters who had been involved in the incident; however, he did not intend to make any arrests if he found them. *Id.* at 20–21. After receiving descriptions of those involved, Brown then left the area in an attempt to look for the youths who had spit at Garcia and Merino. *Id.* at 27.

Brown denies talking to Parson before she confronted Garcia, and claims to have been nowhere near Kittrell Park at the time of the fight. *Id.* at 27, 30. Brown claims that he returned to Kittrell Park about an hour later, in response to a second call apparently related to Parson's assault on Garcia. *Id.* at 28. Brown testified that he was unsure where he was when he received this call, or how long it took him to return to the park. *Id.* at 28–29.

When Brown arrived at Kittrell Park the second time, he stopped Parson as she

was leaving the park and arrested her. *Id.* at 30–32, 39. Parson admitted to Brown that she had punched Garcia. *Id.* at 39. She told Brown she did so because she heard that Garcia had either touched or pushed her son. *See* Defendants' Exhibit D.

Brown acknowledged that he and Parson knew each others' first names, and that she had addressed him by his first name on several occasions though he noted that he did not know her apart from his capacity as a police officer. *Id.* at 41–42. Brown further testified that he had arrested Parson prior to July 26, 2004, and that he was aware that other officers had previously arrested her as well. *Id.* at 8–10. In addition, he also knew that she had previously been involved in a physical altercation with another person. *Id.* at 11.

*Procedural History*

On June 24, 2005, Garcia and Merino brought suit against Brown, Parson, the City of White Plains, and the White Plains Police Department, alleging that Brown and Parson conspired to deprive them of their Fourth and Fourteenth Amendment rights under 42 U.S.C. §§ 1983 and 1985. *See* Complaint ¶¶ 23, 26, 37. Specifically, the complaint alleged that Brown and Parson "conspired and/or had a meeting of the minds by which Brown ratified and/or agreed and/or gave assurance that Parson would not be arrested for her behavior." *Id.* ¶ 18. Additionally, plaintiff brought a claim alleging that the city and police department were negligent in training and supervising their police officers. *Id.* ¶ 40.

Defendant Parson was served, but defaulted in responding to the complaint. She has not participated in discovery. Both plaintiffs and defendants Brown and City of White Plains have moved for default judgment against Parson.

Defendants Brown, City of White Plains, and the White Plains Police Department now move for summary judgment.

**Discussion**

*Standard of Review*

Under Federal Rule of Civil Procedure 56(c), a court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Granting of summary judgment is appropriate "where the nonmovant's evidence is merely colorable, conclusory, speculative, or not significantly probative." *Travelers Ins. Co. v. Broadway W. Street Assoc's.,* 164 F.R.D. 154, 160 (S.D.N.Y.1995) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). Before a district court grants summary judgment, "the record must clearly establish both 'the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment.'" *Pangburn v. Culbertson,* 200 F.3d 65, 69 (2d Cir.1999) (citing *Ramsey v. Coughlin,* 94 F.3d 71, 74 (2d Cir. 1996)). Summary judgment is improper if there is any evidence in the record that would allow a reasonable fact-finder to find in favor of the moving party. On a motion for summary judgment, the court views the record in the light most favorable to the non-moving party and resolves all ambiguities and draws all reasonable inferences against the moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs,* 834 F.2d 54, 57 (2d Cir. 1987).

*Defendants' Motion for Summary Judgment on Federal Claims*

For the reasons set forth below, Defendants' Motion for Summary Judgment on plaintiffs' federal claims is granted as to the City of White Plains, and denied as to Officer Brown. Officer Brown's motion to dismiss on the ground of qualified immunity fails.[1]

As pointed out by defendants in their moving papers, and conceded by plaintiffs in their response, political subdivisions of a municipality, such as police departments, cannot be sued. *See, e.g., LaRouche v. New York*, 369 F.Supp. 565, 567 (S.D.N.Y. 1974). Therefore, the complaint is dismissed as to the "White Plains Police Department" as an independent entity.

1. *The Claim Under 42 U.S.C. § 1983 (First Cause of Action) Is Not Dismissed as to Brown*

Plaintiffs claim that defendant Brown deprived them of their constitutional rights in violation of 42 U.S.C. § 1983 by failing to intervene in the attack, and that he conspired with defendant Parson in violation of 42 U.S.C. § 1985 to deprive them of police protection on the basis of their race and ethnicity.

Defendants respond that plaintiffs cannot demonstrate that they were adversely affected by defendant Brown's actions, and that there is no evidence that Brown and Parson "reached an understanding" to violate their rights.

The elements of a § 1983 claim are: (1) that the conduct in question deprived a person of a right, privilege, or immunity secured by the Constitution or the laws of the United States, and (2) that the acts were attributable at least in part to a person acting under color of state law. *See Dwares v. New York*, 985 F.2d 94, 98 (2d Cir.1993); *Brown–Alleyne v. White*, 96 CV 2507, 1999 WL 1186809, 1999 U.S. Dist. LEXIS 18511 (E.D.N.Y. Oct. 11, 1999).

As a rule, "A State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). However, this Circuit has long recognized an exception to the *DeShaney* rule, whereby state actors can be held liable under § 1983 if they facilitated, created or increased the danger posed by a private citizen. *See Brown–Alleyne*, 1999 WL 1186809 at *2, 1999 U.S. Dist. LEXIS 18511 at *6.

This exception to *DeShaney* was first laid out in *Dwares v. New York*, in which plaintiff alleged that police conspired with "skinheads," assuring them that they would not interfere if the skinheads chose to assault a group of protesters. The district court dismissed the complaint under *DeShaney*. The Second Circuit reversed, however, in light of plaintiff's allegation that the police had agreed to allow the attack, and told the skinheads in advance that they would not be stopped or arrested

---

**1.** In their reply brief, defendants contend that plaintiffs did not comply with Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. Specifically, they contend that plaintiffs failed to submit any objections to defendants' Statement of Facts, and thus defendants' version of events ought to be deemed the uncontroverted facts of this case.

However, while plaintiffs may not have complied with the letter of Rule 56.1 in the filing of their Local Rule 56.1 statement, they did comply with its spirit by submitting their own statement of material facts, in which they both disputed some of the facts put forth by defendants and added others. For this reason, I elect to consider plaintiffs' statement of facts.

if they assaulted the protestors. "Such a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause." *Dwares*, 985 F.2d at 99; *see also Freeman v. Ferguson*, 911 F.2d 52, 54–55 (8th Cir.1990). The court's decision in *Dwares* reflects an exception to the *DeShaney* decision: "[P]olice officers *do* have a duty to assist victims whom they have endangered through their own conduct." *Brown–Alleyne*, 1999 WL 1186809 at *3, 1999 U.S. Dist. LEXIS 18511 at *7–8 (emphasis added). The Second Circuit distinguishes this sort of "state created danger" theory from the theory of liability rejected by the Supreme Court in *DeShaney* because it goes "well beyond allegations that the defendant officers merely stood by and did nothing." *Dwares*, 985 F.2d at 99. Additionally, under the Second Circuit's reasoning (which is not shared by other circuits), this type of liability is not dependent on any "special relationship" between the plaintiff and the state (as is the case under New York law, *see infra*), but rather arises from the fact that the state itself facilitated and encouraged the private attack, thus creating the danger. According to the Second Circuit, the critical distinction between *DeShaney* and *Dwares* is that the former involves a mere passive failure to prevent harm and the latter involves active facilitation.

The Second Circuit clarified the *Dwares* "state created danger" exception in *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir.2005), in which it ruled that a public official could be liable under § 1983 for encouraging another to violate another's rights, even without an explicit promise to look the other way. In *Pena* (which came before the Circuit on a motion to dismiss a *Dwares*-type claim after denial of a pre-answer motion for dismissal on the ground of qualified immunity), the Circuit held, "When ... state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct ... those officials can be held liable under § 1983 .... even though none of the defendants are alleged to have communicated the approval explicitly." *Id.* On a pre-answer motion, the Circuit ruled that *Dwares*-type § 1983 liability could attach to off-duty police officers who (allegedly) had implicitly assured one of their own that he could drink and drive with impunity—even though none of the defendants was alleged to have communicated this explicitly.[2]

Therefore, allegations that police officers deliberately failed to prevent violence carried out by private actors, or sat by and watched it happen, state a claim for a constitutional violation.

But of course we are now beyond the stage when allegations suffice. This is not a motion to dismiss a complaint but a motion for summary judgment. The question before this court is whether the evidence presented by plaintiffs raises a genuine issue of material fact about whether the officer actively facilitated the attack on plaintiffs.

Viewed most favorably to plaintiffs, the evidence shows that Officer Brown, having responded to a call, told Garcia that he would look for her attackers, then talked with one of those attackers (Parson) for about five minutes, following which he watched from his car as Parson attacked Garcia—refusing two direct pleas for assistance in stopping the attack, one from the

---

**2.** The Circuit concluded, however, that this type of implicit liability was not so clearly established as to bar dismissal on the ground of qualified immunity. *Pena*, 432 F.3d at 114–15.

victim's nephew and one from Gonzalez. From this combination of circumstances, plaintiffs claim, reasonable jurors could infer that Brown either expressly or implicitly "authorized" the attack by Parson on Garcia.

Plaintiffs offer not a shred of evidence about what Brown and Parson said to one another during the conversation that allegedly occurred before Parson attacked Garcia. In *Pena*, the Second Circuit recognized, "The key question is whether the individual defendants told, or otherwise communicated to, Officer Grey that he could drink excessively and drive while intoxicated without fear of punishment." *Pena*, 432 F.3d at 111. This record contains no direct evidence that Brown either explicitly assured Parson that she would not suffer retribution, or that he said or did anything that could have led her to reach such a conclusion. This lack of evidence is important because the conversation is the only thing that transforms Brown's alleged failure to intervene in the attack into the sort of "active facilitation" necessary for liability under the Second Circuit's version of the "state created danger" doctrine. The conversation, in other words, is the only thing suggesting that Brown "facilitated" the attack. The key question for this court is whether this case can go to trial in the absence of any direct evidence about what was said during that conversation.[3]

Because *Dwares* and *Pena* were both Rule 12(b)(6) cases, they dealt only with the sufficiency of allegations, and so offer this court no guidance about this case can go to a jury in the absence of any testimony about what was said in the lynchpin conversation. The *Dwares* allegation was predicated on hearsay—an article in the *Village Voice*, in which one skinhead was quoted as saying that the police had given them "verbal license" *Dwares*, 985 F.2d at 100—but because Rule 56 requires competent (that is, admissible) evidence to raise a genuine issue of material fact, the hearsay that sufficed at the pleading stage would not have gotten Dwares past a motion for summary judgment, and mere inaction by the police would not have sufficed to create a genuine issue of fact.

■ However, in light of *Pena* (which holds that the "authorization" or "facilitation" necessary for *Dwares* liability need not be conveyed explicitly), I conclude that plaintiff here offers enough evidence (albeit just enough evidence) to defeat the motion and get the case to trial. If a reasonable jury believed Garcia's version of events (and I emphasize that Brown completely denies Garcia's version of events), it could infer—by coupling the Brown–Parson interaction (which Garcia describes as a five minute conversation) with Brown's extraordinary and most unprofessional inaction during the subsequent attack on Garcia and her daughter—that Brown somehow communicated to Parson that she could proceed with her assault and he would not interfere. Based on Garcia's testimony that Officer Brown allowed Parson to attack her and her daughter while he looked on from his squad car—and that he refused to respond to two pleas for assistance directed to him—a reasonable jury could find that Brown's actions "shocked the conscience," and thus were sufficient to create *Dwares* liability.

Admittedly, plaintiff's theory of liability is not without its problems, the principal

**3.** The question is almost silly, because the reason we have no information about what was said in the conversation is that the person who allegedly participated in it—Brown—cat-egorically denies that any conversation took place. His denial creates a disputed issue of extremely material fact.

one being that Brown denies that the lynchpin conversation ever took place. If a jury believes him (and a reasonable jury certainly could), that is the end of plaintiff's case. Also undercutting the plausibility of plaintiff's story is the fact that Brown actually arrested Parson, charged her with assault, and filled out the relevant incident report—all of which is utterly inconsistent with *Dwares*-type liability on his part. Brown Deposition at 39. However, this court is in no position to make such determinations. Viewing the evidence most favorably to the plaintiff, it is possible that a rational trier of fact could conclude conclude that the arrival of two other officers, including a sergeant, in the Kittrell Park area caused Officer Brown to do a quick about-face and arrest Parson to cover up his own misconduct.

The fact that I need to spin such hypotheticals demonstrates how slender is the reed on which the so-called "state created danger" hangs in this case. However, since I cannot say, looking at the evidence as a whole, that no rational jury could reach the conclusion posited by plaintiff, I must send the case to trial.

 Plaintiffs also allege a Fourth Amendment excessive force violation, contending that the force used against them by Parson ought to be imputed against Officer Brown by virtue of their alleged conspiracy. "In cases such as this one, where the alleged excessive force occurred 'outside the context of an arrest,' plaintiff's § 1983 claim is analyzed under the Fourteenth Amendment Due Process Clause." *DeVito v. Bryant*, 03 Civ.1927, 2005 WL 2033722, at *5, 2005 U.S. Dist. LEXIS 22444 at *15 (S.D.N.Y. Aug. 23, 2005) (citing *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir.1998)). "One embodiment of this still extant claim for relief from excessive force based in Due Process is the situation in which a state actor aids and abets a private party in subjecting a citizen to unwarranted physical harm." *Hemphill*, 141 F.3d at 418. Fourteenth Amendment excessive force claims, as with *Dwares* actions, are analyzed under a "shocks the conscience" test. *DeVito*, 2005 WL 2033722 at *4–5, 2005 U.S. Dist. LEXIS 22444 at *15–16 (citing *Hemphill*, 141 F.3d at 418 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973))). And, as with plaintiffs' *Dwares* claim, the question of whether excessive force had been used in violation of the plaintiffs' Fourteenth Amendment rights is one best addressed by a jury.

Plaintiffs, therefore, are entitled to a trial, but on a single alleged constitutional violation: Officer Brown's purported facilitation of Parson's attack on Garcia and Merino, which violated their Fourteenth Amendment Due Process rights for either of two reasons: because of the force used by Garcia or because Officer Brown elected not to intervene.

### 2. The Claim Under § 1985 (Second Cause of Action) Is Dismissed As To Brown

In addition to the claim brought under 42 U.S.C. § 1983, plaintiffs have asserted claims against Brown (and Parson) under § 1985, contending that they conspired to violate plaintiffs' Equal Protection rights because of their Hispanic heritage. Plaintiffs presumably bring their claim under subsection (3) of § 1985, which provides that:

If two or more persons in any State or Territory conspire...for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws...the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or

deprivation, against one or more of the conspirators.[4]

■■ To prevail on a claim of conspiracy to deprive an individual of civil rights under 42 U.S.C. § 1985, a plaintiff must prove that defendants engaged in (1) a conspiracy; (2) for the purpose of depriving any person or class of persons the equal protection of the law, or of equal privileges and immunities under the law; and (3) an act in furtherance of the conspiracy; (4) which injured such person or class of persons, or deprived them of any rights or privileges owed to them as citizens of the United States. *R–Goshen LLC v. Village of Goshen*, 289 F.Supp.2d 441, 454 (citing *Gray v. Town of Darien*, 927 F.2d 69, 73 (2d Cir.1991), *cert. denied*, 502 U.S. 856, 112 S.Ct. 170, 116 L.Ed.2d 133 (1991)). Significantly, "A conspiracy claim under § 1985 is actionable 'only if it involves a discriminatory animus based on race or some other invidious classification.'" *United Bd. of Carpenters Local 610 v. Scott*, 463 U.S. 825, 829, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 419 (2d Cir.1999).

■ Defendants assert that, even if plaintiffs offer evidence of a *Dwares*-type constitutional violation (and I conclude that they have), they have not submitted enough evidence to demonstrate that a conspiracy existed. Because plaintiffs offer no competent evidence that the attack was motived by racial or ethnic animus, I agree.

In their complaint, Garcia and Merino allege that "Brown has a history of racially motivated incidents against persons of His-

panic ethnicity." Complaint ¶ 33. However, on a motion for summary judgment, a plaintiff may not rest on such conclusory allegations. He must offer proof that to support them that would be admissible at trial. Fed.R.Civ.P. 56(e). Furthermore, the mere fact that Brown and Parson are black while plaintiffs are Hispanic is not enough to support a conclusion of race-based animus. *See Posr*, 180 F.3d at 419.

In support of the motion, defendants offer an affidavit from White Plains Insurance/Risk Manager James Noonan, who testified that no civilian complaints or lawsuits had been filed against Brown dating back to September 22, 1986, when Noonan assumed his position. *See* Affidavit of James Noonan, Defendants' Exhibit J ("Noonan"). Further, Police Chief James Bradley notes in another affidavit, "There are no psychological written reports which concern bias, anger, or racial prejudice towards civilians regarding Larry Brown." Affidavit of James Bradley, Defendants' Exhibit I ("Bradley").

Plaintiff offers no competent evidence to counter this testimony. The Joint Pre–Trial Order identifies two witnesses— Richard Morales and Jose Guadalupe— who ostensibly would testify that Officer Brown acted in a hostile manner towards members of the Hispanic community. *See* Pre–Trial Order at 5. Unfortunately, the record contains no testimony or affidavits from either of them. Nor do plaintiffs offer any evidence that Brown used derogatory language about Hispanics, or engaged in any behavior to indicate that he harbored animus against Hispanics as a group.

---

**4.** In their complaint, plaintiffs do not specify the subsection of § 1985 upon which their claim is predicated. Since subsection (1) deals with conspiracies to prevent federal officials from carrying out their duties, and subsection (2) deals with obstructing justice and intimidating parties, witnesses, and jurors, I have proceeded under the assumption that plaintiffs were relying on subsection (3) in filing their complaint. *Bowman v. City of Middletown*, 91 F.Supp.2d 644, 662 n. 5 (S.D.N.Y.2000).

Plaintiffs do cite to Garcia's deposition, where she notes that on one occasion, she saw Officer Brown remove beer from a park patron's bag and give them to an African–American male to whom they did not belong to. Garcia Deposition at 42–43. This does not evidence bias against Garcia on racial or ethnic grounds. She also alleges that "some guys" had told her that they wanted to report Officer Brown for an incident which occurred at a Hispanic parade, and that another Mexican man, whose name she does not know, once told her that he "was going to report" Officer Brown. *Id.* at 44–45. Needless to say, these hearsay (and double hearsay) statements are not competent evidence and so cannot raise a genuine issue of material fact.

Because the record before me contains no competent evidence of racial or ethnic animus on Brown's part, I conclude that plaintiffs have failed to raise a genuine issue of fact on one element of a § 1985 conspiracy claim. Following *United Brotherhood* and *Posr*, Brown's motion for summary judgment on the § 1985 claim must be granted.[5]

### 3. The Federal Claims (First and Second Causes of Action) Are Dismissed Against the City

The complaint appears to assert the federal claims against all defendants, including the City of White Plains. *See* Complaint ¶¶ 23, 26–28. White Plains has moved to dismiss.

In their response papers, plaintiffs concede that they cannot make out a *Monell* claim against the City. *Monell v. Dep't of*

*Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Additionally, plaintiffs fail to offer evidence that the City of White Plains was a part of this conspiracy. "A municipality cannot 'conspire' except through the actions of individual policymaking officials." *Brown–Alleyne*, 1999 WL 1186809 at *5, 1999 U.S. Dist. LEXIS 18511 at *13. There is no evidence that any policymaking official of the City participated in any conspiracy.

Therefore, the City's motion for summary judgment dismissing plaintiffs' federal claims is granted.

### 4. Brown's Motion for Qualified Immunity Is Denied.

Defendant Brown argues in the alternative that he is entitled to dismissal of the federal claims on the ground of qualified immunity.

Plaintiffs argue that Brown has waived his qualified immunity defense by failing to make a timely motion prior to the commencement of discovery, as provided by this court's rules.

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court directed that, as qualified immunity was meant to shield public officials from the burden of participating in a lawsuit, the issue should be decided at the earliest opportunity, preferably before discovery. Accordingly, this Court's Individual Practice Rules require that any defendant planning to claim qualified immunity must (1) file a pro forma motion for summary judgment on that ground along with his answer; (2) depose the plaintiff and file additional papers in support of the quali-

---

**5.** This does not mean that the jury will not hear evidence that would have related to the purported conspiracy. There is no requirement under § 1983 that a party be motivated by racial or ethnic animus—only that, while acting under color of state law, he deprived a person of some right secured by the constitution or laws of the United States. So testimony about the conversation (or the lack of any conversation) between Parson and Brown is still relevant. Indeed, it is the sine qua non of the *Dwares* claim.

fied immunity motion within thirty days thereafter; and (3) obtain a decision on the motion before conducting further discovery. *See* Ind. Practices of J. McMahon, Rule 3(C). The defendants in this case did not follow this procedure, but rather waited until the end of discovery to move for summary judgment on the ground of qualified immunity. Under my rules, the failure to obtain a qualified immunity determination at the outset means that I will not consider the defense on a belated motion, leaving the matter for trial.

However, Brown counters that under this Court's Individual Practice Rule, a plaintiff who brings an action in which a defense of qualified immunity is to be anticipated must send defense counsel a copy of this rule. According to defendants' reply papers, plaintiffs did not do so.

As neither party appears to have complied with this Court's Individual Practice Rules, I will consider the motion.

■■■■ "The doctrine of qualified immunity shields police officers acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Williams v. City of Mt. Vernon,* 428 F.Supp.2d 146, 153–54 (S.D.N.Y.2006) (quoting *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999)); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow,* the Supreme Court held that a government official is entitled to qualified immunity if (1) the plaintiff fails to allege a violation of a federal right; (2) the right alleged was not clearly established at the time of the violation; or (3) the defendant's actions were objectively reasonable in light of the legal rules that were established at the time they were taken. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211–12 (2d Cir.2003).

The initial inquiry is whether the complaint sufficiently alleges the violation of a federal right. In this case, as demonstrated above, plaintiffs' version of events, taken as true, states cognizable due process and equal protection violations based on Officer Brown's active facilitation of Parson's attack on plaintiffs. Brown's denial of the key facts (such as participating in any pre-attack conversation with Parson) is, for qualified immunity purposes, irrelevant.

The more interesting question is whether that right was clearly established in this Circuit at the time of the alleged misconduct. Answering that question depends on analyzing the factual underpinnings of plaintiff's theory of liability—or, as the Supreme Court put it in *Saucier,* on an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151.

■■■■ A right is clearly established when "the contours of the right [are]...sufficiently clear that a reasonable official would understand that what he is doing violates that right...[T]he unlawfulness must be apparent." *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997) (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). After *Dwares,* the law in this Circuit clearly provides that police officers who give express permission to a private citizen to injure another are violating the injured person's Due Process rights. But not until *Pena*-which came down a year after the events that are the subject of this lawsuit—was it clearly settled that giving implicit permission for a private civil rights violation qualified as unconstitutional. Indeed, the Second Circuit dismissed the case against the defendants in *Pena* on qualified immunity grounds.

The question, then, is whether the facts of this case are closer to those of *Dwares* than of *Pena*. If the former, the right was clearly established at the time of the alleged wrongdoing; if the latter, it was not.

I conclude that the facts of this case are far closer to those of *Dwares* than of *Pena*.

Critical to the Second Circuit's analysis in *Pena* was the allegation that numerous police officers, over an extended period of time, created a permissive atmosphere in which defendant Officer Grey felt he could drink and drive with impunity—even though no officer ever expressly told him he could do so. The fact that such long-term conduct was not addressed in *Dwares* was critical to the Circuit's qualified immunity ruling:

> Although it is a close question.... *Dwares* did not address, let alone decide, whether repeated inaction on the part of government officials over a long period of time without an explicit statement of approval, might effectively constitute such an implicit 'prior assurance' that it rises to the level of an affirmative act. *Dwares* also did not indicate whether government officials may implicitly send a message of official sanction by engaging in related misconduct themselves or by participating in or tolerating such a practice.

*Pena*, 432 F.3d at 115.

Nothing in this case suggests that Brown generally tolerated Parson's unlawful behavior in the past and so gave Parson the idea that she was free to do as she pleased on the evening in question. Plaintiff's case hinges on a jury's finding that a particular interaction (which Brown denies) actually took place, and the inferences that can be logically drawn from what happened after that particular interaction took place. That fact pattern is on all fours with *Dwares*, where the allegation was that police officers allowed skinheads to understand that they could attack demonstrators with impunity.

Because the facts of this case are far closer to those of *Dwares* than of *Pena*, I conclude that Officer Brown does not qualify for qualified immunity under the second prong of *Harlow*.

Finally, to defeat a claim of qualified immunity, it must be shown that it was not objectively reasonable for defendant to believe that his actions were "lawful at the time of the challenged conduct." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995). Objective reasonableness is established where "officers of reasonable competence could disagree" about whether or not the defendant's actions were legal. *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 349, 106 S.Ct. 1092, 1100, 89 L.Ed.2d 271 (1986)). Thus, in this case, the question is whether any reasonable police officer could have believed that the conduct about which plaintiff testified would not have violated a citizen's clearly established rights.

According to plaintiffs' testimony, Officer Brown talked with Parson for approximately five minutes before she entered the park to confront Garcia, after which Brown sat in his squad car, facing the park, and watched as Parson and the group of youngsters attacked Garcia and Merino. If this testimony is true (and I am not saying that it is—that is for a jury to determine), no reasonable police officer could have thought that he was privileged to act (or not act) as Officer Brown did—especially a policeman who was aware, as Brown was, that Garcia had been assaulted by the same individuals only moments earlier.

Accordingly, Brown is not entitled to qualified immunity.

Of course, if it ultimately turns out that plaintiffs' allegations are not true—for ex-

ample, if the jury believes Brown's story, in which the purported five minute conversation never took place—then Brown will prevail, "not because of qualified immunity but because he did nothing wrong." *Dolson v. Village of Washingtonville*, 382 F.Supp.2d 598, 601 (S.D.N.Y.2005) (McMahon, J.). This Circuit has held that a defendant's assertion that plaintiff's constitutional rights were not violated, or that her version of events is incorrect, goes to the merits of the case, not to whether or not an official is entitled to qualified immunity. *See Stephenson v. Doe*, 332 F.3d 68, 78–79 (2d Cir.2003) (citing *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151). Therefore, it is no defense to a claim of qualified immunity that defendant did not do what plaintiffs said that he did. Plaintiffs have the right to have a jury resolve all disputed issues of material fact. *Dolson*, 382 F.Supp.2d at 601.

### 5. The Court Reserves on the Motion for Summary Judgment on the State Law Claim

Both Brown and the City have moved for summary judgment dismissing the third cause of action, which asserts a state law negligence claim against them. For the reasons set forth below, the court reserves on the motion and will take up the matter at the close of plaintiff's case.

■■■ In their complaint, plaintiffs contended that the City of White Plains was negligent in the training and supervising of their police officers. *See* Complaint ¶ 40. Were that the claim being pursued, I would not hesitate to dismiss it. To succeed on New York State law claim of negligent training or supervision, a plaintiff must present specific evidence demonstrating how the employer's practices were insufficient. *See. e.g., Phelps v. City of New York*, 04 Civ. 8570, 2006 WL 1749528 at, *6–7, 2006 U.S. Dist. LEXIS 42926 at *20 (S.D.N.Y. Jun. 27, 2006). Plaintiffs offer no evidence whatsoever that would allow a reasonable fact-finder to conclude that the City acted negligently in training or supervising Brown. In fact, they offer no evidence about training or supervision at all. The state law failure to train claim (which I assume was also intended to be the basis for a *Monell* claim) appears to have been abandoned along with the *Monell* claim, and it will not be entertained at trial.

Plaintiffs' revised contention, as set forth in the Pre–Trial Order, is that Officer Brown and the City of White Plains were negligent in failing to act and prevent the attack of the plaintiff. Although such claims are disfavored, they are recognized as an exception to the usual rule that New York declines to hold municipalities liable in tort for their failure to provide police and fire protection to individuals. *See Cuffy v. City of New York*, 69 N.Y.2d 255, 513 N.Y.S.2d 372, 505 N.E.2d 937 (1987), *see also Merced v. City of New York*, 986 F.Supp. 774, 780 (S.D.N.Y.1997) (citing *Sorichetti v. City of New York*, 65 N.Y.2d 461, 492 N.Y.S.2d 591, 482 N.E.2d 70 (1985)) (New York court will find municipalities liable for tortious injuries if the plaintiff can demonstrate the existence of a "special relationship" between herself and the municipality).

Defendants argue that plaintiffs have not offered evidence to support their contention that the factors necessary for imposition of this type of liability (which I will refer to as *Cuffy* liability) are present in this case.[6] In particular, defendants

---

**6.** There is a four-prong test which a plaintiff must satisfy in order to demonstrate that a "special relationship" existed:

(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who

assert that plaintiff has failed to alleged any "special relationship" between Garcia and the police, which is a necessary predicate to *Cuffy* liability (and the manner in which *Cuffy* liability is theoretically distinct from *Dwares* liability).

Defendants also contend that plaintiffs cannot recover from the City for any alleged negligence on the part of Officer Brown because a municipality cannot be held liable for discretionary errors made by municipal agents in their exercise of governmental functions.

Plaintiffs' state claim against both Brown and the City is asserted as negligence, and both sides brief this issue as though it were possible to find that Officer Brown acted negligently in this matter. However, I am not sure that, on any reasonable view of the evidence, negligence is a fair inference. To the contrary: plaintiffs' story, if believed, gives rise only to an inference of intentional conduct (or, really, lack of conduct) on Brown's part. Given plaintiffs' insistence that there was a prior agreement between Brown and Parson that Brown would not intervene in Parson's attack on Garcia (necessary for *Dwares* relief), it seems impossible that a reasonable trier of fact could assume that Brown had negligently failed to intervene in the attack, as, say, by failing to notice that the attack was taking place. (I will assume for the moment that Brown's alleged promise that he would "try to search" for the group of young women who

had spit at Garcia and Merino, and his urging that she use the park's emergency call system if her attackers returned, qualifies as an assumption by the municipality of an affirmative duty to act on Garcia's behalf, as required for imposition of *Cuffy* liability).

If Officer Brown was not negligent, then it stands to reason that no negligence can be imputed vicariously to the City of White Plains. In imputed negligence cases, "the foundation of the action is still negligence, or other fault, on the part of [the tortfeasor]". William L. Prosser, *Law of Torts*, § 69, at 458 (4th ed.1971). "It is still an action for negligence, and the ordinary rules of negligence liability are still applied to it." *Id.*

However, the parties have not considered this argument, and since defendants did not raise it, plaintiffs have had no opportunity to cast the evidence in a light different than the one used to support *Dwares* liability against Brown. The parties also have not briefed the issue of whether plaintiffs' theory of state law liability encompasses an intentional tort on Brown's part, and this court is not willing to permit amendment of the pleadings—particularly since the claim originally pleaded claim, which itself was never amended, has clearly been abandoned. Nor have the parties discussed whether intentional misconduct on Brown's part (rather than negligence) can be the basis for vicarious municipal liability.[7] Since we

---

was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.
*Cuffy,* 69 N.Y.2d at 260, 513 N.Y.S.2d 372, 505 N.E.2d 937.

**7.** Plaintiffs do cite to *Julmis v. City of New York,* 194 A.D.2d 522, 598 N.Y.S.2d 312 (2d

Dept.1993) for the proposition that courts have found a special relationship between a citizen and the police when police respond to a citizen complaint and then fail to intervene when a crime is committed in their presence. In *Julmis,* two police officers responded to a car accident between an off-duty officer and a cabdriver. Despite assuring the cabdriver that they would not allow harm to come to him, the officers looked on as he was assaulted by the off-duty officer. In affirming the

148

are going to trial anyway, the time for the parties to marshal these arguments is at the close of plaintiffs' case.

**Conclusion**

The motion of the City of White Plains for summary judgment dismissing all federal claims asserted against it is granted, as is defendant Brown's motion for summary judgment dismissing the claim for conspiracy to violate civil rights under 42 U.S.C. § 1985. Brown's motion for summary judgment dismissing the claim under 42 U.S.C. § 1983 is denied. The court reserves on the motion to dismiss the third cause of action.

This constitutes the decision and order of the Court.

jury's verdict in favor of the plaintiff, the court determined that a special relationship had been formed between the city and the cabdriver as a result of the officers witnessing the assault. The Appellate Division also stated in passing that "the respective negligence of the parties" is a factual question that ought to be left to the jury (*id.* at 523, 598 N.Y.S.2d 312), which statement this Court finds singularly odd, since there was nothing negligent about anyone's actions on the facts posited in the opinion.